[No. D058963. Fourth Dist., Div. One. Apr. 11, 2012.]

AXIS SURPLUS INSURANCE COMPANY, Plaintiff and Respondent, v. GLENCOE INSURANCE LTD., Defendant and Appellant.

COUNSEL

Munro Smigliani & Jordan, R. Michael Jordan, Douglas J. Munro and David M. Plouff for Defendant and Appellant.

Branson, Brinkop, Griffith & Strong, Harry A. Griffith and John R. Campo for Plaintiff and Respondent.

OPINION

**HUFFMAN, Acting P. J.**—Axis Surplus Insurance Company and Glencoe Insurance Ltd. provided general liability insurance in favor of Pacifica Pointe L.P. Pacifica was sued in a construction defect suit and tendered claims to both Axis and Glencoe. Axis agreed to defend Pacifica subject to a reservation of rights. Glencoe declined the tender, but monitored the construction defect suit and asked Pacifica to inform it once it satisfied the self-insured retention (SIR) under the Glencoe policy.

Pacifica and Axis paid a total of $1 million to settle the construction defect suit. Although Glencoe refused to participate in the settlement, it approved of Pacifica contributing its SIR ($250,000) as part of the settlement, which Pacifica did.

After settling the construction defect suit, Axis sued Glencoe for declaratory relief and equitable contribution to recover at least a portion of the $750,000 it paid in settlement. After a bench trial, the court found in favor of Axis and allocated a 60/40 split of Axis's settlement payment, to the advantage of Axis.

Glencoe appeals, claiming the court committed reversible error in finding Axis proved a potential for coverage under the Glencoe policy. In addition, Glencoe argues the court abused its discretion in allocating the amounts of contribution. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### The Construction Defect Litigation

In September 2004, Pacifica purchased the Carmel Pointe apartments. It subsequently converted the apartments to condominiums, and in turn, sold the condominiums to individual owners. A homeowners association called the Carmel Pointe Homeowners Association (Association) then was created. The Association filed a construction defect suit against Pacifica. The Association brought claims for breach of warranties, negligence, nuisance, negligent misrepresentation, and intentional misrepresentation arising out of the condominium conversion project at Carmel Pointe.

### The Tenders

Based on the construction defect suit, Pacifica tendered a claim to Axis. Axis provided insurance coverage to Pacifica through a general liability

insurance policy issued to the Commercial Industrial Building Owners Alliance, Inc. (CIBA), under policy No. ELP712476-05 from March 31, 2005, to March 31, 2006. The policy contained a $500,000 "per occurrence" SIR that was subject to an aggregate and was satisfied by the payment of claims unrelated to the construction defect suit. Axis also provided insurance coverage to Pacifica through a second policy issued to CIBA as policy No. ELP700696-04 from March 31, 2004, to March 31, 2005. This policy also had a $500,000 "per occurrence" SIR that was subject to an aggregate and was satisfied by the payment of claims unrelated to the underlying litigation.

The Axis policies provided primary coverage with limits of liability of $5 million and $10 million and with defense expense outside the limit of liability. The Axis policies contained an "other insurance" clause, which provided for the sharing of a loss with a coinsurer by equal shares if the coinsurer also provides for sharing by equal shares. The Axis policies provided coverage for liability for property damage caused by an occurrence during their respective terms. The policies defined property damage as physical damage to tangible property caused by an occurrence or loss of use of property not physically damaged caused by an occurrence.

Axis accepted Pacifica's tender subject to a reservation of rights. Axis originally provided Pacifica with a defense under Axis policy No. ELP700696-04. However, the policy limits were exhausted in May 2008 as a result of unrelated claims. Axis then provided Pacifica with a defense under policy No. ELP712476-05. Axis paid $118,624.50 in attorney fees and costs on behalf of Pacifica in the construction defect suit.

Pacifica also tendered a claim to Glencoe. Glencoe issued a wrap-up/owner controlled insurance policy (No. CL-10586-00) to Pacifica specifically for the Carmel Pointe construction project with a policy period from September 2, 2004, through September 2, 2007. The Glencoe policy had a $5 million limit per occurrence and in the aggregate. The Glencoe policy provided coverage for property damage defined as physical damage to tangible property caused by an occurrence after the retroactive date of the policy prior to expiration of the extended reporting period. The retroactive date of the Glencoe policy is September 2, 2004, and the extended reporting period expires September 2, 2017.

The Glencoe policy contained an SIR in the amount of $250,000. The policy stated Glencoe had no duty to investigate or defend any claim until

Pacifica satisfied the SIR. It also contained an "other insurance" provision similar to the one found in the Axis policy.

Glencoe did not accept Pacifica's tender, but instead, reserved its rights under its policy and requested that Pacifica provide evidence that it had satisfied the SIR.

The Settlement of the Construction Defect Suit

Although Glencoe declined to defend Pacifica, the construction defect suit progressed with Axis providing Pacifica's defense. The Association produced a preliminary defects list with a total cost of repair of $13,976,250, which included relocation costs and acoustical claims.

On October 22, 2008, the Association made a $1 million settlement demand on Pacifica, which would expire on November 14, 2008. Pacifica and the Association agreed to extend the expiration of the settlement to December 17, 2008.

In response to the Association's settlement demand, Pacifica sent experts to Carmel Pointe to evaluate defects and deficiencies and prepare a preliminary scope and cost of repair. Pacifica instructed its experts to identify all potential defects and not just those defects claimed by the Association. The experts created a preliminary repair estimate totaling $1,466,747.50. Pacifica's cost of repair did not include the Association's acoustical claims or relocation costs.

On November 3, 2008, Pacifica advised Glencoe about the Association's $1 million settlement demand. Before the end of November 2008, Glencoe was advised of the preliminary cost of repair calculated by Pacifica's experts.

On December 16, 2008, the day before the settlement demand was to expire, Glencoe responded to Pacifica's request for approval of the settlement. Glencoe stated in part: "It is our understanding that JPI West Coast [(the original owner/developer of Carmel Pointe)], as well as its direct and additional insurers are of the opinion that the information available at this time is insufficient to warrant contribution towards settlement. We share that concern when asked to fund a settlement without their contribution. We also have a concern with respect to the unorthodox manner of negotiation and settlement as well as the effective scope of the settlement negotiated on an expedited basis. [¶] . . . [¶] Axis' most recent demand for contribution requires an analysis of causation and damage which the current information available does not allow. The current deadline imposed by the [Association]

does not allow [Glencoe] to fully evaluate this matter. We have inquired about an extension of time to respond to the settlement. We have been advised that an extension is not likely to be provided. We renew our request for an extension. Accordingly, while we lack sufficient information to agree to fund a settlement at this time, we will not object to Pacifica contributing its SIR to a settlement funded by Axis up to the proposed $1,000,000."

Glencoe also did not agree the settlement was for a covered loss.

On December 22, 2008, the Association and Pacifica entered into a written settlement agreement. On December 30, 2008, Axis issued a check to the Association for $750,000 as partial payment of the settlement. Eight days later, Pacifica issued a check to the Association for $250,000 toward funding the settlement and satisfying the $250,000 SIR under the Glencoe policy.

### The Suit for Equitable Contribution

On August 11, 2009, Axis filed an action against Glencoe alleging causes of action for declaratory relief and equitable contribution. The first cause of action for declaratory relief sought a declaration from the court that the Glencoe policy applied to the construction defect suit and Glencoe was obligated for an equitable share of the defense costs and settlement Axis paid to resolve it. The second cause of action for equitable contribution sought an award of damages representing an equitable contribution from Glencoe toward the defense costs and settlement Axis paid.

The parties decided that trial would be submitted to the court on an agreed record consisting of stipulated facts, documents, and excerpts of deposition transcripts. In its trial brief, Axis conceded it was not making any claim for reimbursement of the defense costs it paid on behalf of Pacifica in the construction defect suit. Accordingly, the trial court only needed to decide whether the Glencoe policy potentially covered Pacifica in the construction defect suit, and if so, determine Glencoe's equitable contribution to the $750,000 settlement that Axis paid to resolve it.

Along with their trial briefs and exhibits, Axis and Glencoe filed separate proposed statements of decision. After careful consideration of all evidence and the arguments of the parties, the trial court filed its statement of decision. There is no indication in the record that either party objected to the court's statement of decision.

The court determined Axis had met its burden of proof to establish a claim for equitable contribution with regard to the $750,000 Axis paid to settle the construction defect suit on behalf of Pacifica. The court then concluded that a

60/40 split of the $750,000 settlement payment in favor of Axis was the most equitable result. Therefore, Axis was awarded $450,000 as damages against Glencoe.

Glencoe timely appealed.

## DISCUSSION

■ Equitable contribution is available to apportion a loss among several insurers when each of those insurers is " ' "obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others." . . . "The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others." ' " (*Safeco Ins. Co. of America v. Superior Court* (2006) 140 Cal.App.4th 874, 879 [44 Cal.Rptr.3d 841] (*Safeco*), quoting *Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1089 [97 Cal.Rptr.2d 374].)

In this appeal, Glencoe raises two issues. First, it contends the court erred in finding Axis met its burden of proving there was potential for coverage under the Glencoe policy. Second, it asserts the court abused its discretion by failing to apportion Axis's $750,000 settlement payment using the equal shares method called for in the "other insurance" clauses in the Glencoe and Axis policies. We reject both of these contentions.

### I

### *THE COURT PROPERLY FOUND THAT AXIS MET ITS BURDEN OF PROOF*

#### A. Standard of Review

The parties disagree on the appropriate standard of review for the first issue Glencoe raises. Without any authority, Axis argues we apply an abuse of discretion standard. Axis is incorrect.

Citing *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619], Glencoe asserts we should apply a de novo standard because we are deciding whether an insurer has a duty to defend. *Waller* involved the interpretation of an insurance policy and whether it covered economic losses that cause emotional distress. (*Ibid.*) Here, the interpretation of the Glencoe policy is not disputed. That said, to the extent

we need to interpret any of the Glencoe policy, we agree with Glencoe that we should apply a de novo standard because there was no extrinsic evidence presented at trial, and thus no factual dispute as to its meaning. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589]; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 818 [274 Cal.Rptr. 820, 799 P.2d 1253].)

The trial in this matter, however, involved more than the court interpreting Glencoe's policy. Nevertheless, Glencoe argues we also apply a de novo standard when the trial court decides questions of law based on stipulated facts. (*Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 437 [129 Cal.Rptr.2d 436].) This is not the correct standard on the record before us. The trial court considered the parties' respective trial briefs, an agreed-upon record, and proposed statements of decisions submitted by each party. The agreed-upon record included stipulated facts plus exhibits and deposition testimony. As such, the court did not merely decide questions of law based on stipulated facts, and a de novo standard is inappropriate.

Instead, the application of the Glencoe policy language involves disputed facts or inferences drawn from undisputed facts. We therefore review the trial court's findings for substantial evidence. "We begin with the presumption that the record contains evidence to uphold every finding of fact and appellant has the burden to demonstrate there is no substantial evidence to support the findings under attack. [Citation.] ' "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." [Citations.]' " (*North American Capacity Ins. Co. v. Claremont Liability Ins. Co.* (2009) 177 Cal.App.4th 272, 285 [99 Cal.Rptr.3d 225], italics omitted, citing *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

In addition, we review the trial court's implied factual findings for substantial evidence. "Under the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision. . . . The appellant also must bring ambiguities and omissions in the factual findings of the statement of decision to the trial court's attention. If the appellant fails to do so, the reviewing court will infer the trial court made every implied factual finding necessary to uphold its decision, even on issues not addressed in the statement of decision. The question then becomes whether substantial evidence supports the implied factual findings." (*Fladeboe v. American Isuzu*

*Motors Inc.* (2007) 150 Cal.App.4th 42, 48 [58 Cal.Rptr.3d 225].) In this case, as Glencoe " 'did not raise any objections to the statement of decision[, we] are required to presume the trial court made all findings necessary to support the judgment.' " (*Id.* at p. 60, quoting *Sammis v. Stafford* (1996) 48 Cal.App.4th 1935, 1942 [56 Cal.Rptr.2d 589].)

### B. Payment of the SIR

■ In an action for equitable contribution by a settling insurer against a nonparticipating insurer, the settling insurer has met its burden of proof when it makes a prima facie showing of potential coverage under the nonparticipating insurer's policy. (*Safeco, supra,* 140 Cal.App.4th at p. 877.) The settling insurer does not have to prove actual coverage. (*Id.* at p. 879.) After the settling insurer has satisfied its burden of proof, the burden shifts to the nonparticipating insurer to prove an absence of actual coverage under its policy. (*Ibid.*)

Here, the court found Axis satisfied its burden of proof in proving the potential of coverage under the Glencoe policy. Glencoe, however, argues the court erred because the evidence is insufficient. Specifically, Glencoe asserts, under *Safeco, supra,* 140 Cal.App.4th 874, Axis had to prove Pacifica's $250,000 payment was for covered "property damage" as defined in the Glencoe policy. Glencoe therefore insists not only does Axis have to show that Pacifica paid $250,000 to satisfy its SIR, but it must show that this payment only applied to covered property damage. We disagree.

■ Pacifica paid the $250,000 as part of a settlement. By settling, the parties forgo their right to have liability "establish[ed]" by a trier of fact, and the settlement "becomes presumptive evidence of the [insured's] liability and the amount thereof, which presumption is subject to being overcome by proof. [Citation.] . . . ' ". . . A contrary rule would make the right to settle meaningless . . . ." ' " (*Phoenix Ins. Co. v. United States Fire Ins. Co.* (1987) 189 Cal.App.3d 1511, 1526–1527 [235 Cal.Rptr. 185] (*Phoenix Ins. Co.*) [equitable indemnity action]; see *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791–792 [244 Cal.Rptr. 655, 750 P.2d 297] [same presumption when insured settles a claim, then sues insurer to recover the amount of the settlement].) While none of these cases address the precise issue before us, we see no reason why the rule in *Phoenix Ins. Co., supra,* 189 Cal.App.3d at pages 1526–1527, which was cited with approval in *Safeco, supra,* 140 Cal.App.4th at page 880, would not apply to Pacifica's payment of its SIR as part of a settlement.

By settling, the parties avoid the cost and uncertainty of litigation. The settlement and the amount of the settlement are thus presumptive evidence of the insurer's liability and the amount of liability. (See *Safeco, supra,* 140 Cal.App.4th at p. 880, quoting *Phoenix Ins. Co., supra,* 189 Cal.App.3d at pp. 1526–1527.) In other words, the settlement is presumed to be made for only damages covered under the applicable policy. Because the settlement here included the insured's payment of the SIR, the SIR shares the presumptive effect of the settlement as well, and Axis had no obligation to prove the SIR applied only to "covered property damage" as defined in the Glencoe policy. Further, Glencoe specifically approved Pacifica's payment of its SIR toward settlement. To apply a different rule to payment of an SIR as part of a settlement would undermine the benefits of settlement.[1]

### C. The Timing of Pacifica's Satisfaction of the SIR

Glencoe also asserts the court erred in finding Axis satisfied its burden of proof because Axis did not and cannot establish Glencoe had a legal obligation to provide a defense prior to the date of settlement. (See *Safeco, supra,* 140 Cal.App.4th at p. 879.) Glencoe argues its legal obligation to provide Pacifica with a defense in the construction defect suit could only be triggered after Pacifica satisfied the SIR. Pacifica and the Association entered into their settlement agreement on December 22, 2008. To fund a portion of the settlement, Axis issued a check in the amount of $750,000 to the Association on December 30, 2008. Pacifica then issued a check in the amount of $250,000 to fund the remainder of the settlement on January 7, 2009. Thus, Glencoe argues the earliest Axis could show a potential for coverage under the Glencoe policy was on January 7, 2009, after the parties entered into a settlement agreement. As such, Glencoe insists Axis cannot satisfy its burden of proof under *Safeco, supra,* at page 879. We are not persuaded.

Glencoe accurately cites *Safeco,* among other reasons, for the general rule: "In an action by an insurer to obtain contribution from a coinsurer, the inquiry is whether the nonparticipating coinsurer 'had a *legal obligation* . . . to provide [a] defense [or] indemnity coverage for the . . . claim or action prior to [the date of settlement],' and the burden is on the party claiming coverage to show that a coverage obligation arose or existed under the coinsurer's policy." (*Safeco, supra,* 140 Cal.App.4th at p. 879, quoting

---

[1] Glencoe also argues that the court improperly found Axis proved $1 million of covered property damages because the evidence offered by Axis is insufficient to prove this fact. Thus, Glencoe asserts Axis failed to show Pacifica's payment of the SIR was for $250,000 of covered property damages for this reason as well. Because we conclude Axis did not have any such burden, Glencoe's argument regarding the proof of $1 million of covered property damage is without merit.

*American Continental Ins. Co. v. American Casualty Co.* (2001) 86 Cal.App.4th 929, 938 [103 Cal.Rptr.2d 632], italics added by *American* (*American Continental*).) The purpose of this rule is to ensure courts will not order a coinsurer to contribute to a loss that it had no obligation to pay under the terms of its policy. (See *Safeco, supra*, 140 Cal.App.4th at p. 879; *American Continental, supra*, at pp. 937–938.) Here, Glencoe argues it could not have an obligation prior to the settlement of the construction defect suit because Pacifica only satisfied its SIR in paying a portion of the settlement. It does not argue it never received notice of the suit, the action giving rise to Pacifica's tender (the Carmel Pointe construction project) was outside the scope of the Glencoe policy, or its insured was not a named defendant in the construction defect suit. Glencoe's argument thus concerns the timing of its obligation to indemnify rather than the absolute absence of any obligation whatsoever. This distinction becomes critical when we explore the origin of the legal obligation rule cited in *Safeco, supra*, at page 879 and *American Continental, supra*, at page 938.

In *Safeco, supra*, 140 Cal.App.4th 874, the court did not address the timing of when an insurer has a legal obligation to an insured. Thus, except for the general rule regarding a coinsurer's legal obligation to provide coverage, *Safeco* provides us little guidance. We thus turn to *American Continental, supra*, 86 Cal.App.4th 929, on which *Safeco* relies, to better understand the origination of the subject rule.

In *American Continental*, the court addressed whether multiple insurers had an obligation to a common insured. (*American Continental, supra*, 86 Cal.App.4th at p. 937.) The plaintiff sued a hospital and four doctors for medical malpractice. (*Id.* at p. 934.) During a deposition, a nurse, who tended to the plaintiff while she was at the hospital, admitted she failed to do certain essential tasks. (*Ibid.*) The plaintiff, however, never named the nurse as a defendant or served her in the action. (*Ibid.*)

The hospital tendered its defense to its insurer, American Continental, which undertook its defense. (*American Continental, supra*, 86 Cal.App.4th at p. 934.) American Continental negotiated a settlement on behalf of the hospital and its employees (which included the nurse). (*Ibid.*) Prior to negotiating the settlement, American Continental discovered the nurse was personally insured by American Casualty. American Continental demanded American Casualty participate in the defense and settlement of the action. American Casualty refused. (*Ibid.*) After settling the matter, American Continental sued American Casualty for, among other things, equitable contribution. (*Id.* at p. 935.) American Casualty demurred to the complaint, arguing

no obligation to provide coverage had arisen. The trial court sustained the demurrer without leave to amend. (*Ibid.*)

The Court of Appeal affirmed the trial court's judgment and concluded American Casualty's obligation to provide coverage did not arise. (*American Continental, supra,* 86 Cal.App.4th at p. 933.) It held "that where an insurer was never under any legal obligation to provide coverage under a policy of liability insurance, that insurer may not be required to contribute to the defense or indemnity costs which may have been incurred by a second insurer in defending and settling an action . . . from the negligent acts of a common insured who was not named as a defendant in said suit and against whom no claim of negligence was ever made." (*Id.* at p. 933.) The court noted the nurse was not sued and never became legally obligated to pay any amount to the plaintiff, which would have triggered coverage under her policy. (*Id.* at pp. 938–939.) The court stressed the failure of the plaintiff to sue the nurse or make any claim against her was a dispositive fact distinguishing the "case from all other California cases applying the equitable contribution doctrine." (*Id.* at p. 941.) Further, the court acknowledged the "novel facts" involved in the case. (*Id.* at p. 933.)

While *American Continental* and the instant action both involve claims between primary insurers for equitable contribution, the similarity between the cases ends there. Unlike in *American Continental,* here the insured (Pacifica) was a named defendant and tendered claims to both primary insurers (Axis and Glencoe). Although Glencoe did not agree to defend Pacifica, it reserved its rights under its policy, requested Pacifica to provide evidence that it had satisfied the SIR, and monitored the construction defect suit. Further, Glencoe claimed to lack sufficient information to agree to fund any settlement, but it did "not object to Pacifica contributing its SIR to a settlement funded by Axis up to the proposed $1,000,000." *American Continental* simply is inapposite to the instant matter.

In addition, the cases on which *American Continental* relied to reach its holding do not address the issue before us. The cases the court cited in *American Continental, supra,* 86 Cal.App.4th at page 938 where the courts declined to enforce an insurer's contribution claim did not involve the timing of the satisfaction of an SIR. (See *Old Republic Ins. Co. v. Superior Court* (1998) 66 Cal.App.4th 128, 154 [77 Cal.Rptr.2d 642], disapproved on another ground in *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 841, fn. 13 [88 Cal.Rptr.2d 366, 982 P.2d 229] [loss paid by plaintiff insurer not covered under policy of defendant insurer because it was contract liability not tort liability]; *Great American West, Inc. v. Safeco Ins.* (1991) 226 Cal.App.3d

1145, 1152–1153 [277 Cal.Rptr. 349] [loss payment was made to insured by plaintiff insurer more than four years after the expiration of the one-year time limit in defendant insurer's policy; thus, any claim under defendant's policy was unenforceable]; *United Pacific Ins. Co. v. Hanover Ins. Co.* (1990) 217 Cal.App.3d 925, 939 [266 Cal.Rptr. 231] [even though paid by plaintiff insurer, the loss was not covered under any of the policies issued by the multiple insurers involved].)

Glencoe cites two other cases that involve the satisfaction of an SIR: *Clarendon America Ins. Co. v. North American Capacity Ins. Co.* (2010) 186 Cal.App.4th 556 [112 Cal.Rptr.3d 339] (*Clarendon*) and *Forecast Homes, Inc. v. Steadfast Ins. Co.* (2010) 181 Cal.App.4th 1466 [105 Cal.Rptr.3d 200] (*Forecast*).[2] Neither case, however, is helpful with the issue before us. *Clarendon* concerns the interpretation of an insurer's policy and whether the SIR applied to one claim or each of the eight houses involved in the claim. (See *Clarendon, supra,* 186 Cal.App.4th at p. 564.) *Forecast* involves the interpretation of an insurer's policy and whether an additional insured could satisfy the named insured's SIR. (See *Forecast, supra,* 181 Cal.App.4th at pp. 1476–1484.)

None of the authority cited by Glencoe deals directly with the timing of the payment of the SIR in the context of a settlement in determining if an insurer's legal obligation to provide coverage existed. For its part, Axis does not even bother to address Glencoe's argument.[3] Our independent research failed to uncover any case dealing with facts analogous to those before us. Thus, we are faced with a novel issue.

■ Like the court in *Safeco, supra,* 140 Cal.App.4th at page 879, we accept the rule set forth in *American Continental, supra,* 86 Cal.App.4th at page 938: A critical inquiry in any action for equitable contribution between insurers is whether the nonparticipating coinsurer had a legal obligation to provide a defense or indemnity coverage for the claim prior to the settlement of a claim. In applying this rule to the facts before us, however, we keep in mind that an equitable contribution claim between coinsurers is not based

---

[2] Glencoe cites *Forecast* for the proposition that until Pacifica satisfied the SIR, the court should have considered the Glencoe policy to be an excess policy. (See *Forecast, supra,* 181 Cal.App.4th at p. 1474.) Although we acknowledge that some courts have recognized policies which are subject to SIR's are "excess policies," and insurers under those policies have no duty to indemnify until SIR is exhausted (*Pacific Employers Ins. Co. v. Domino's Pizza, Inc.* (1998) 144 F.3d 1270, 1276–1277), we do not believe the analogy between primary and excess insurance should be carried that far under the facts before us. (See *Forecast, supra,* at p. 1474.) Further, Glencoe, later in its brief, concedes it is Pacifica's primary insurer.

[3] This was a consistent flaw throughout Axis's respondent's brief.

upon contract, but instead involves " 'equitable principles designed to accomplish ultimate justice in the bearing of a specific burden.' " (*Signal Companies, Inc. v. Harbor Ins Co.* (1980) 27 Cal.3d 359, 369 [165 Cal.Rptr. 799, 612 P.2d 889].)

 " 'California follows the general rule that an insurer that discharges a common obligation of another insurer may seek contribution from the second insurer. [Citations.] The insurers' "respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden." [Citation.] No specific rule governs this area of the law. Courts should consider the nature of the claim, the relation of the insured to the insurers, the particulars of each policy and any other equitable considerations. [Citation.]' " (*Fire Ins. Exchange v. American States Ins. Co.* (1995) 39 Cal.App.4th 653, 664 [46 Cal.Rptr.2d 135], quoting *Northern Ins. Co. of New York v. Allied Mutual Ins.* (9th Cir. 1992) 955 F.2d 1353, 1360.) In other words, in an equitable contribution action, a court reviews the applicable facts and policies and decides what is fair between the potential coinsurers. Of course, if one insurer never had an obligation to provide coverage, it would be extremely unfair to enforce a contribution action. (See *American Continental, supra*, 86 Cal.App.4th at p. 938.) This is not the case here.

The Glencoe policy specifically insured Pacifica for its construction project at Carmel Pointe. Pacifica was sued for alleged construction defects arising out of the Carmel Pointe project. Pacifica tendered its claim to Glencoe. Glencoe did not agree to defend, but instead, monitored the litigation and requested to be informed when Pacifica satisfied its SIR. During his deposition, a Glencoe representative acknowledged potential coverage existed assuming the SIR was satisfied. Pacifica did not satisfy the SIR until it contributed to the settlement of the construction defect suit because Axis, a coinsurer, was defending Pacifica. While Glencoe did not agree to contribute to the settlement, it specifically approved of Pacifica's payment of its SIR as part of the settlement. Thus, this is not a case where Glencoe had no notice of the claim or settlement. (See *American Internat. Specialty Lines Ins. Co. v. Continental Casualty Ins. Co.* (2006) 142 Cal.App.4th 1342, 1366 [49 Cal.Rptr.3d 1].) In addition, the trial court found "Glencoe never made any effort to secure the authority necessary to settle, or contribute to the settlement of the [construction defect suit] even though the insured was facing a time-sensitive settlement opportunity."

To allow Glencoe to defeat an equitable contribution claim merely based on the timing of the payment of the SIR would award Glencoe for its inaction and work an injustice. Glencoe appears to have been hiding behind the SIR requirement in its policy, gambling that Pacifica would not satisfy it because Axis was providing Pacifica with a defense in the construction defect suit. We decline to adopt a rule sanctioning such gamesmanship.

■ In short, the unique facts of this case warrant that we create a limited exception to the rule enunciated in *Safeco, supra,* 140 Cal.App.4th at page 879 and *American Continental, supra,* 86 Cal.App.4th at page 938 regarding the timing of an insurer's legal obligation to provide coverage. When the insured has tendered a claim to the nonparticipating insurer, the nonparticipating insurer's duty to defend is subject to the insured satisfying an SIR, and the insured satisfies the SIR as payment of a settlement of which the nonparticipating insurer was aware, the timing of the insured's payment of the SIR does not prevent the settling insurer from establishing the nonparticipating insurer's legal obligation to cover the underlying claim. To apply a more rigid rule in this matter would undermine the equity inherent in an equitable contribution action. (See *Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1094 [97 Cal.Rptr.2d 374] [the purpose of a claim for equitable contribution is " 'to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others' "].)

### D. Substantial Evidence Supports the Court's Judgment

Glencoe also challenges the court's finding that Axis proved at least $1 million of covered property damage. Glencoe's challenge, however, is misguided.[4] We are not concerned with the amount of property damage Axis proved at trial. Axis did not have to prove actual coverage, just the potential for coverage under the Glencoe policy. (See *Safeco, supra,* 140 Cal.App.4th at p. 879.) We conclude substantial evidence supports the court's finding that Axis had shown a prima facie case of potential coverage under the Glencoe policy.

Pacifica was a named insured under the Glencoe policy, which specifically covered Pacifica's construction project at Carmel Pointe. The underlying litigation arose out of alleged construction defects at Carmel Pointe. Based on the construction defect suit, Pacifica tendered claims to both Axis and Glencoe. Axis accepted Pacifica's tender subject to a reservation of rights. Glencoe reserved its rights under its policy and requested Pacifica provide evidence that it had satisfied the SIR.

Although Glencoe did not agree to defend Pacifica, it monitored the construction defect suit. Indeed, a Glencoe representative testified during his deposition that Glencoe was monitoring the underlying litigation because

---

[4] To the extent Glencoe is attempting to challenge the amount of the settlement, it is prohibited from doing so. Because Pacifica and the Association settled, the amount of settlement is "presumptive evidence of the [insured's] liability" (*Phoenix Ins. Co., supra,* 189 Cal.App.3d at pp. 1526–1527), and a nonparticipating coinsurer waives his right to challenge the reasonableness of the amount of settlement. (See *Safeco, supra,* 140 Cal.App.4th at p. 881.)

there existed the potential for coverage if Pacifica satisfied its SIR. Glencoe argues its representative's deposition testimony does not constitute an admission that Glencoe owed a duty to defend Pacifica in the underlying litigation. We, however, do not see anywhere in the record where the court made this finding based on the deposition testimony. Instead, we agree with the court that the testimony established Glencoe viewed the satisfaction of the $250,000 as the key trigger to potential coverage under the policy:

"Q. And during that entire time, Glencoe was monitoring the file because it understood that there was at least a potential for coverage under its policy for the claims being asserted in the underlying action; correct?

"A. That's a fair statement provided the SIR is satisfied."[5]

The Association made a $1 million settlement demand. Pacifica then sent experts to evaluate the defects and deficiencies at the project. Their preliminary cost of repair was $1,466,747.50. The Association's preliminary cost of repair was $13,976,250. Although Glencoe did not agree to contribute to any settlement, it informed Pacifica it did "not object to Pacifica contributing its SIR to a settlement funded by Axis up to the proposed $1,000,000." Moreover, the court found that Glencoe did nothing to obtain authority to contribute to the settlement of the construction defect suit.

Pacifica then settled the underlying litigation for $1 million. Axis paid $750,000 of the settlement, and Pacifica contributed $250,000.

Despite this abundance of evidence, Glencoe claims that certain evidence in the record (primarily Axis's expert reports) cannot establish covered damages of any amount. Again, Glencoe confuses Axis's burden of proof. Axis does not have to prove actual coverage under the Glencoe policy, just the potential of coverage. (See *Safeco, supra,* 140 Cal.App.4th at p. 879.) Thus, Axis did not have to establish covered damages of any amount, but merely that the claims in the construction defect suit were potentially covered under the Glencoe suit. (*Id.* at p. 877.) We agree with the court that it did so. Indeed, we struggle to contemplate a stronger case showing potential coverage under a policy than the one before us.

Because we are satisfied substantial evidence supports the court's finding that Axis satisfied its burden of proof, the burden switched to Glencoe to prove an absence of actual coverage. (See *Safeco, supra,* 140 Cal.App.4th at p. 881.) Here, Glencoe does not argue the court erred in finding it did not

---

[5] The deponent added the phrase "provided the SIR is satisfied" during his review and signing of the deposition transcript.

satisfy its burden. Nor could it. There is no indication that Glencoe ever inspected the Carmel Pointe project or talked to any party or counsel involved in the construction defect suit. Indeed, Glencoe's expert witness admitted he had not been to the Carmel Pointe project, was not sure where the project was located, and had not taken any pictures of the project. He further testified that he was not retained to evaluate what was "property damage," and he did not know how that term was defined in the Glencoe policy. Simply put, there is nothing in the record that would even allow Glencoe to begin to prove actual coverage did not exist.

## II

### THE COURT DID NOT ABUSE ITS DISCRETION IN ALLOCATING LIABILITY

Glencoe insists the court abused its discretion in allocating liability because it did not apportion liability using the equal shares method found in the "other insurance" clauses in the Glencoe and Axis policies. Both the Axis and Glencoe policies contain substantially similar "other insurance" provisions. These provisions state the respective insurer will share with other primary insurance on an equal basis so long as the other insurer also allows contribution on an equal share basis. Glencoe concedes it and Axis are both primary insurers. Based on these facts, Glencoe asserts the court could not use equity to override the terms of the policies and should have allocated contribution equally between Axis and Glencoe. We disagree.

We review the trial court's ultimate equitable determination in allocating liability among the responsible insurers for abuse of discretion. (*Scottsdale Ins. Co. v. Century Surety Co.* (2010) 182 Cal.App.4th 1023, 1033 [105 Cal.Rptr.3d 896]; *Hartford Casualty Ins. Co. v. Travelers Indemnity Co.* (2003) 110 Cal.App.4th 710, 724 [2 Cal.Rptr.3d 18].) An abuse of discretion occurs when, in light of applicable law and considering all relevant circumstances, the court's ruling exceeds the bounds of reason. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339] (*Shamblin*); *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].)

When a trial court is required to evaluate claims for equitable contribution among multiple liability insurers, each insuring the same insured on the same claim, the trial court exercises its discretion and weighs the equities seeking to attain distributive justice and equity among the mutually liable insurers. (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293 [77 Cal.Rptr.2d 296] (*Fireman's Fund*).) The court may consider numerous factors in making its determination, including the

nature of the underlying claim, the relationship of the insured to the various insurers, the particulars of each policy, and any other equitable considerations. (*Truck Ins. Exchange v. Unigard Ins. Co.* (2000) 79 Cal.App.4th 966, 974 [94 Cal.Rptr.2d 516] (*Truck*).)

Here, the court carefully considered the relationship between Pacifica and both Axis and Glencoe, the terms of the Glencoe policy (including policy limits), and time on risk (the Glencoe policy was issued for three years and the Axis policies were issued for two years). The court specifically noted it was "balancing all the pertinent factors including the greater time on risk and limits by Glencoe with the co-insurance provisions in both policies and the facts and circumstances regarding the covered claims in each carrier's policies and the participation in the settlement by Axis. . . ."

Glencoe does not argue the court improperly considered these factors, misinterpreted the Glencoe policy, or failed to consider other factors. Instead, Glencoe asserts the court could only allocate liability equally under the "other insurance" provisions in the Axis and Glencoe policies. Glencoe's position is contrary to established California law (see *Fireman's Fund, supra,* 65 Cal.App.4th at p. 1293; *Truck, supra,* 79 Cal.App.4th at p. 974), and we decline to create a new rule on the record before us.

The only authority Glencoe cites in support of its position is *Hartford Casualty Ins. Co. v. Travelers Indemnity Co., supra,* 110 Cal.App.4th 710.) However, *Hartford* does not stand for the proposition urged by Glencoe: in allocating liability for a claim of equitable contribution, a trial court has no discretion to allocate liability beyond the terms of the primary insurers' respective policies if the policies contain substantially similar other insurance provisions. In fact, *Hartford* did not deal with one primary insurer suing another primary insurer for equitable contribution. Instead, there, the primary insurer sued the excess insurer for equitable contribution and claimed the trial court erred by failing to ignore the "excess clause" in the excess insurer's policy and award contribution. (*Id.* at pp. 716, 724.) In affirming the trial court's decision, the Court of Appeal concluded the specific facts of the case did not warrant the use of equity to override the terms of the insurance policies in a dispute between a primary insurer and an excess insurer. (*Id.* at p. 727.) No analogous facts exist here. *Hartford* therefore is not helpful.

Here, the court's allocation of liability did not exceed the bounds of reason. (See *Shamblin, supra,* 44 Cal.3d at pp. 478–479.) We are satisfied the court did not abuse its discretion.

## DISPOSITION

The judgment is affirmed. Axis is awarded its costs on this appeal.

Haller, J., and Aaron, J., concurred.